ALANEL CORPORATION, ETC. *v.* INDIANAPOLIS
REDEVELOPMENT COMMISSION ET AL.

[No. 29,704. Filed December 12, 1958.]

*Henry W. Blue* and *Grabill & Baker,* of counsel, both of Indianapolis, for appellant.

*Harry T. Ice, Robert D. Risch, Robert D. McCord, Jr.,* and *Ross, McCord, Ice & Miller,* of counsel, all of Indianapolis, for appellees Indianapolis Redevelopment Commission, Richard H. Oberreich, Fred T. Greene, J. Albert Smith, Charles E. Wagner, and Paul L. McCord.

*Michael B. Reddington,* of Indianapolis, for appellees, City of Indianapolis, Phillip T. Bayt and Charles H. Boswell.

BOBBITT, J.—Appellant, Alanel Corporation, brought this action, for itself and on behalf of all others similarly situated, seeking to enjoin appellees from proceeding under ch. 276 of the Acts of 1945, and ch. 170 of the Acts of 1957, being §§48-8501, *et seq.,* Burns' 1950 Replacement, to condemn appellant's property, issue bonds, to pay acquisition costs, and levy taxes to pay the principal and interest on such bonds.

The complaint alleges that the Redevelopment Act of 1945 and the 1957 Supplementary Act are unconsti-

tutional under Art. 1, §1, Art. 1, §21, Art. 13, §1, Art. 11, §13, and Art. 4, §19 of the Constitution of Indiana and the Fourteenth Amendment of the Constitution of the United States. These allegations present the only questions for our determination.

The different questions raised and discussed in appellant's brief will be considered in the same order as there presented.

Section 2 of the 1945 Act declares the public policy in pertinent part to be that the housing accommodations in blighted areas are, to a large extent, unsanitary and unsafe, and that the use of the same causes an increase in and spread of disease and crime, constituting a menace to the health, safety, morals and welfare of the residents of the larger cities in this State; that the conditions existing in such areas necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety; that the clearance, replanning and redevelopment of such blighted areas is a public and governmental function which cannot be accomplished through the ordinary operations of private enterprise, due to the necessity for the exercise of the power of eminent domain; that the clearance, replanning and redevelopment of such areas will benefit the health, safety, morals and welfare of the cities in which such blighted areas exist and the State of Indiana; and that the clearance, replanning and redevelopment of such blighted areas are public uses and purposes for which public money may be spent and private property acquired.

Section 3 of the 1945 Act defines a blighted area as "any area within the corporate limits of a city to which this act is applicable, or in unincorporated territory within one thousand [1,000] feet of such cor-

porated limits, which because of lack of development, cessation of growth, deterioration of improvements or character of occupancy, age, obsolescence, substandard buildings or other factors which have impaired values or prevent a normal development of property, or use thereof, has become under current conditions undesirable for or impossible of normal development and occupancy."

Sections 11 and 12 of the 1945 Act and §1 of the 1957 Act empower the Development Commission to study, investigate, select and acquire such areas within the Redevelopment District as such Commission may determine to be blighted and cannot be corrected by regulatory processes or by the ordinary operations of private enterprise.

Section 1 of the 1957 Act further provides that the Redevelopment Commission created and operating under the Redevelopment Act of 1945 shall be authorized to plan and undertake, alone or in conjunction with other departments of the city, "projects for rehabilitating, preventing the spread of or eliminating slums, blighted, deteriorated or deteriorating areas, both residential and nonresidential, which projects may include the repair or rehabilitation of buildings or other improvements by the commission, owners or tenants, the acquisition of real property, the demolition and removal of buildings or improvements on buildings acquired by the commission where necessary to eliminate unhealthful, unsanitary or unsafe conditions, lessen density, reduce traffic hazards, eliminate obsolete or other uses detrimental to public welfare, . . ."

On October 2, 1957, the Redevelopment Commission of Indianapolis adopted a declaratory resolution, in pertinent part, as follows:

"WHEREAS, the Commission has made investigations, studies and surveys of various blighted areas within the City of Indianapolis, Indiana, and of the costs contributing to the blighting of such areas; and

"WHEREAS, such investigations, studies and surveys have been made in cooperation with the various departments and bodies of the City and have been directed to determining the proper use of land so as to best serve the interests of the City and its inhabitants, both from the standpoint of human and economic values, and as a result of such investigations, studies and surveys the Commission has heretofore found that the area hereinafter described has become blighted to such an extent that such conditions cannot be corrected by regulatory process or by the ordinary operations of private enterprise without resort to the provisions of the Redevelopment Act of 1945, as supplemented by Chapter 170 of the Acts of 1957, and that the public health and welfare would be benefitted by the acquisition and redevelopment of such area under the provisions of said acts; and

"WHEREAS, the Commission now finds that the area hereinafter described is one in which: (a) the buildings are used in part as dwelling accommodations and in part for commercial purposes; (b) the housing accommodations are to a large extent unsanitary and unsafe, and the use of the same causes an increase and spread in disease and crime; (c) the buildings used for commercial purposes are to a large extent unsanitary and unsafe; (d) the conditions existing in said area necessitate excessive and disportionate [disproportionate] expenditure of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities of the City, and impair the value of property in surrounding areas; (e) the existing conditions result in the reduction of the value of taxable property within the City; (f) the conditions are beyond remedy and control by regulatory process because of the obsolete and deteriorated character of the buildings and other improvements, faulty planning and land use, shifting of population and

technological and social changes; (g) the acquisition and redevelopment of said area in accordance with the general plan hereinafter referred to will benefit the health, safety, morals and welfare, and will serve to protect and increase property values in the City and the State; (h) such acquisition and redevelopment of said area are public uses and purposes; and

. . . .

"BE IT RESOLVED by the Indianapolis Redevelopment Commission that the area which is bounded and described as follows:

"(Here describing real estate to be taken); is hereby found and declared to be a blighted area within the meaning of the Redevelopment Act of 1945, as supplemented by Chapter 170 of the Acts of 1957; that said blighted area constitutes a menace to the social and economic interests of the City and its inhabitants, and it will be of public utility and benefit to acquire such area and to redevelop the same under the provisions of said acts."

The area which the Commission proposes to acquire consists of eight acres and, including appellant's property, is presently devoted 60% to commercial use and 40% to residential use.

Appellant does not contend that its land is not within a planned area as defined in the Act. Nor does it question the legality of the action or proceedings of the Commission, if the Acts under which they have proceeded are constitutional.

*First:* Appellant asserts that the "definitions, guides and standards" set forth in the Act are "vague and insufficient," and do not meet the requirements of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States.

"Courts are always reluctant to strike down legislative enactments, especially when they have

been long acquiesced in, and he who raises the question of constitutionality must assume the burden of making it clearly appear. When it is asserted that a statute is so indefinite that its enforcement would result in a denial of due process or amount to an unauthorized delegation of legislative functions, the court must consider the enactment in the light of the problems with which the Legislature was undertaking to deal. . . . such statutes are valid when they clearly designate the dangers and hazards against which the Legislature sought to provide protection and reasonably indicate the means or methods by which that is to be accomplished." *Illinois Steel Company* v. *Fuller* (1939), 216 Ind. 180, 185, 186, 23 N. E. 2d 259.

"While a law as enacted must be complete, where the legislature has laid down a standard which is as definitely described as is reasonably practicable, . . . it may authorize an administrative agency to determine whether facts or circumstances exist upon which the law makes or intends to make its own action depend, but it cannot confer upon any body or person the power to determine what the law shall be." *State ex rel. Standard Oil Co.* v. *Review Bd.* (1951), 230 Ind. 1, 8, 101 N. E. 2d 60.

We also recently said in *Matthews* v. *State* (1958), 237 Ind. 677, 681, 682, 148 N. E. 2d 334, 336:

"Reasonable standards must be imposed where the Legislature delegates discretionary powers to an administrative officer. *Ennis* v. *State Highway Commission* (1952), 231 Ind. 311, 326, 108 N. E. 2d 687. However, the policy of the Legislature and the standards to guide the administrative agency may be laid down in very broad and general terms. Such terms get precision from the knowledge and experience of men whose duty it is to administer the statutes, and then such statutes become reasonably certain guides in carrying out the will and intent of the Legislature. *Mutual Film Corp.* v. *Industrial Commission of Ohio* (1915), 236 U. S. 230, 245, 35 S. Ct. 387, 59 L. Ed. 552, 560;

42 Am. Jur., Public Administrative Law, §45, p. 346.

"Courts generally are less strict in requiring specific standards to guide the licensor where the subject-matter of the Act is closely related to the public safety, health, morals or general welfare. 73 C. J. S., Public Administrative Bodies and Procedure, §30, p. 329."

Similar standards to those prescribed in the Act here in question have, without exception, been found sufficient by courts of other states. See: *Foeller* v. *Housing Authority of Portland* (1953), 198 Ore. 205, 256 P. 2d 752; *Belovsky* v. *Redevelopment Authority* (1947), 357 Pa. 329, 54 A. 2d 277, 172 A. L. R. 953; *Ajootian* v. *Providence Redevelopment Agency* (1952), 80 R. I. 73, 91 A. 2d 21; *David Jeffrey Co.* v. *City of Milwaukee* (1954), 267 Wis. 559, 66 N. W. 2d 362; *Redevelopment Agency of City, etc.* v. *Hayes* (1954), 122 Cal. App. 2d 777, 806, 266 P. 2d 105, and cases there cited; *American P. & L. Co.* v. *Securities and E. Com.* (1946), 329 U. S. 90, 105, 91 L. Ed. 103, 116, 67 S. Ct. 133.

Section 12 of the 1945 Act provides that the Redevelopment Commission, before acquiring any area for redevelopment, must make special findings:

1. That the area is blighted to such an extent that such condition cannot be corrected by regulatory processes, or by the ordinary operations of private enterprise, without resort to the provisions of the Act;
2. That the public health and welfare would be benefited by the acquisition and redevelopment of such area;
3. That the blighted area constitutes a menace to the social and economic interests of the city and its inhabitants; and
4. That it will be of public utility and benefit to acquire the area and redevelop the same.

Sections 14 and 15 of the 1945 Act provide for remonstrance and review by the courts.

Where, as here, specific findings are required, with a right of review by the courts, more general standards are usually permissible. *United States* v. *Rock Royal Co-operative* (1939), 307 U. S. 533, 576, 83 L. Ed. 1446, 1471, 59 S. Ct. 993; *Highland Farms Dairy* v. *Agnew* (1937), 300 U. S. 608, 616, 81 L. Ed. 835, 842, 57 S. Ct. 549.

Without burdening this opinion with a repetition of a definition of guides and standards as set forth in §3 of the 1945 Act, and §1 of the 1957 Act, it is our opinion that, when measured by the rules as enunciated by this and other courts of appeal in the authorities above cited, the standards prescribed in the Redevelopment Acts of 1945 and 1957 are sufficient to meet the requirements of the Due Process Clause of the Constitution of the United States.[1] *Edwards* v. *Housing Authority of City of Muncie* (1939), 215 Ind. 330, 339-340, 19 N. E. 2d 741.

*Second:* Appellant next asserts that the Act violates §§1 and 21 of Art. 1 of the Constitution of Indiana in that it is an invalid exercise of the police power because the taking of commercial property has no relation to the public health, safety or morals.

In §2 of the 1945 Act (§48-8502, Burns' 1950 Repl.) the Legislature has declared that the clearance and redevelopment of blighted areas will benefit the health, safety, morals and welfare, and that the clearance, replanning and redevelopment of such blighted areas are public uses and purposes.

---

1. *Financial Aid Corporation* v. *Wallace* (1939), 216 Ind. 114, 23 N. E. 2d 472, 125 A. L. R. 736; *Blue* v. *Beach* (1900), 155 Ind. 121, 56 N. E. 89, 50 L. R. A. 64; *Kryder* v. *State* (1938), 214 Ind. 419, 15 N. E. 2d 386; *State ex rel. Reed* v. *Howard, Warden* (1946), 224 Ind. 515, 69 N. E. 2d 172.

While such statement by the Legislature is not controlling on this court, it does express the public policy of the State on this question and is entitled to careful and sympathetic consideration. The primary purpose of the Redevelopment Act is the elimination of slums and blighted areas. "Blighted" is determined by *area* and not by individual property. While appellant's property is commercial and it may be perfectly maintained—yet there is no evidence here that its character is other than that prescribed for blighted property by the Redevelopment Act of 1945 and the 1957 Act supplemental thereto. Even though the property here involved may not itself be "blighted," yet it may be subject to condemnation under the Act because it is located in a "blighted area," and its taking is necessary to clear the area.

In considering a similar question, the Supreme Court of Delaware in *Randolph* v. *Wilmington Housing Authority* (1958), Del., 139 A. 2d 476, at page 484, said:

> "This argument overlooks the fact that in condemning property to eliminate a slum the act requires the Authority to deal with an area, not with separate individual buildings. The test of the existence of a slum is the substantial preponderance of unsafe and unsanitary structures in the area. That the application of this test bears hardly upon an owner of sound property is undoubtedly true; but hardship may always exist when the power of eminent domain is exercised. The legislature has determined that the feasible method of accomplishing slum clearance is by clearing an area; and we cannot say that such a determination is manifestly unreasonable."

It seems to us that the reasoning in the Wilmington Housing Authority Case applies with equal force to the question here before us. See also: *Berman* v. *Parker* (1954), 348 U. S. 26, 34-36, 99 L. Ed. 27, 75

S. Ct. 98; *State* v. *Rich* (1953), 159 Ohio St. 13, 110 N. E. 2d 778, 789-90; *Stockus* v. *Boston Housing Authority* (1939), 304 Mass. 507, 24 N. E. 2d 333; *Foeller* v. *Housing Authority of Portland, supra* (1953), 198 Ore. 205, 256 P. 2d 752; *Hunter* v. *Redevelopment Authority* (1953), 195 Va. 326, 78 S. E. 2d 893; *Gohld Realty Co.* v. *City of Hartford* (1954), 141 Conn. 135, 104 A. 2d 365.

This court has held that the clearance of slum areas is a public use for which the power of eminent domain may be exercised. *Edwards* v. *Housing Authority of City of Muncie, supra* (1939), 215 Ind. 330, 336, 19 N. E. 2d 741. See also: *State* v. *Rich, supra* (1953), 159 Ohio St. 13, 110 N. E. 2d 778, 787; *Belovsky* v. *Redevelopment Authority, supra* (1947), 357 Pa. 329, 54 A. 2d 277, 282-83, 172 A. L. R. 953; *Randolph* v. *Wilmington Housing Authority, supra* (1958), Del., 139 A. 2d 476, 483; *Foeller* v. *Housing Authority of Portland, supra* (1953), 198 Ore. 205, 256 P. 2d 752, 769.

It seems logically to follow that if the taking of property for slum clearance[2] constitutes a public use or purpose, the taking of property to eliminate a blighted area as it is defined in the Act would also constitute a public use or purpose. If the power of eminent domain can be exercised in the case of slum clearance, it follows that it likewise can be exercised in the elimination and redevelopment of blighted areas.

Appellant relies upon a statement from *Edens* v. *City of Columbia* (1956), 228 S. C. 563, 91 S. E. 2d 280, at page 284, quoting from *Schneider* v. *District of Columbia, D. C.* (1953), 117 F. Supp. 705, 720, as follows:

---

2. See: Acts 1947, ch. 374, §1, p. 1494, being §48-8103, Burns' 1950 Repl. for definition of "slum," as contained in the Housing Authorities Act of 1937, as amended.

"'One man's land cannot be seized by the Government and sold to another man merely in order that the purchaser may build upon it a better house or a house which better meets the Government's idea of what is appropriate or well-designed.'"

We do not believe that to be the precise situation here. The resale of any property in the area takes place only after the public use or purpose—the slum clearance or elimination of a blighted area—has been accomplished. Hence, the resale of any of the property by the Redevelopment Commission is only incidental to the avowed purpose of the Act.

*Third:* Section 2 of the 1957 Act authorizes an indebtedness of one-half of one per cent of the assessed value of the district. Appellant asserts that this is an attempt to evade the provisions of Art. 13, §1 of the Constitution of Indiana by creating another special taxing district.

That the Legislature has the power to create special taxing districts for designated purposes is well-settled in this State. *Johnson* v. *Board of Park Commissioners* (1930), 202 Ind. 282, 174 N. E. 91; *Dept. of Pub. Sanitation* v. *Solan* (1951), 229 Ind. 228, 97 N. E. 2d 495; *Archer, Jr., etc. et al.* v. *City of Indpls., etc.* (1954), 233 Ind. 640, 644, 122 N. E. 2d 607.

This court, speaking through Judge Gilkison, in *Dept. of Pub. Sanitation* v. *Solan, supra* (1951), 229 Ind. 228, at page 240, 97 N. E. 2d 495, in deciding what is a "public local improvement," said:

"In a state growing rapidly in population and even more rapidly in scientific discovery, that which is considered an outstanding luxury in one decade

frequently becomes an absolute necessity in the next. For this reason it is not possible for a court to announce a hard and fast rule defining a 'public local improvement' that will be binding upon legislatures and courts in future years. On the contrary the definition must be left sufficiently flexible to take care of the necessities of the future."

We reaffirm this rule.

In our opinion a redevelopment district such as is provided by the Redevelopment Acts of 1945 and 1957 is clearly a local improvement within the meaning of that phrase as used in the special taxing district decisions of this court. Hence, neither of the Acts violates any of the provisions of Art. 13, §1 of the Constitution of Indiana.

*Fourth:* The 1945 Act does not establish a separate corporation but merely creates "a department of redevelopment" in addition to the existing executive departments of cities having a population of more than three hundred thousand. Acts 1945, ch. 276, §4, p. 1219, being §48-8504, Burns' 1950 Replacement.

The Act of 1945 does not create a separate municipal corporation by a special Act of the Legislature in violation of Art. 11, §13 of the Constitution of Indiana. *Book* v. *Indianapolis-Marion Bldg. Auth. et al.* (1955), 234 Ind. 250, 263, 126 N. E. 2d 5; *Indiana State Toll Bridge Commission* v. *Minor* (1957), 236 Ind. 193, 139 N. E. 2d 445; *Johnson* v. *Board of Park Commissioners, supra* (1930), 202 Ind. 282, 174 N. E. 2d 91.

*Fifth:* Appellant further asserts that the titles of the 1945 and 1957 Acts "do not embrace the entire subjects contained in the respective Acts," in violation of the provisions of Art. 4, §19 of the Constitution of Indiana.

The title of ch. 276 of the Acts of 1945 is as follows:

"AN ACT concerning the redevelopment of blighted areas in certain cities, providing for the establishment of special taxing districts for such purpose, and declaring an emergency."

The title of ch. 170 of the Acts of 1957 is as follows:

"AN ACT supplementing the provisions of an act entitled 'An Act concerning the redevelopment of blighted areas in certain cities, providing for the establishment of special taxing districts for such purpose, and declaring an emergency,' approved March 7, 1945, and repealing certain laws."

That part of Art. 4, §19 of the Constitution of Indiana which provides that the subject of an Act shall be expressed in the title, is designed only for titles narrower than the enactment. *State, P. R. R. Co. et al.* v. *Iroq. Cons. Dist. Ct. et al.* (1956), 235 Ind. 353, 359, 133 N. E. 2d 848.

In *State, P. R. R. Co. et al.* v. *Iroq. Cons. Dist. Ct., supra,* we recently said:

". . . if a title expresses the general purpose of the Act, everything contained in the Act which is germane to the purpose or properly connected therewith as a means of making the Act effective is covered by the title. It is not necessary that the title should contain a complete abstract of the contents of the Act or enumerate all its provisions in detail."

In *City of Indianapolis et al.* v. *Buckner et al.* (1954), 233 Ind. 32, 37-38, 116 N. E. 2d 507, we held the title of an Act reading as follows:

"AN ACT creating a municipal health and hospital corporation in counties having a population of more than 500,000 according to last preceding United States census, defining its powers and duties and declaring an emergency."

sufficient to include provisions for the levying of taxes, the issuance of bonds, and the dissolution of local health boards and departments.

It seems logically to follow that the titles to the Acts here in question are sufficient to include the creation of a Commission, the acquisition of property by the power of eminent domain, the issuance of bonds and the levying of a tax to retire such bonds and to pay the interest thereon. See also: *Mogilner* v. *Metropolitan Plan Comm., etc. et al.* (1957), 236 Ind. 298, 325, 140 N. E. 2d 220.

*State, P. R. R. Co. et al.* v. *Iroq. Cons. Dist. Ct. et al., supra* (1956), 235 Ind. 353, 133 N. E. 2d 848, relied upon by appellant is not applicable here because the title in that case was one narrow in character, which specified four particular branches of the general subject of drainage, but did not include the creation of a new court. The titles of the Redevelopment Acts are broad in nature—concerning generally the germane subject-matter found in the Acts—and are sufficient to meet the requirements of Art. 4, §19 of the Constitution of Indiana.

*Sixth:* Finally, appellant contends that the taking of the fee title to property by the Redevelopment Commission violates Art. 1, §1 of the Constitution of Indiana and the Fourteenth Amendment of the Constitution of the United States.

Under §3 of the 1945 Act and §1 of the 1957 Act redevelopment may include replatting, rezoning, change or installation of streets and utilities and disposition of property, "on such terms and conditions and for such use and purposes as will best serve the interests of the cities to which this act is applicable and their citizens."

It is clear that the purposes of the Act could not be accomplished without the fee title to the underlying real estate.

The Supreme Court of the United States has answered appellant's contention here as follows:

"The District Court indicated grave doubts concerning the Agency's right to take full title to the land as distinguished from the objectionable buildings located on it. 117 F. Supp. 705, 715-719. We do not share those doubts. If the Agency considers it necessary in carrying out the redevelopment project to take full title to the real property involved, it may do so. It is not for the courts to determine whether it is necessary for successful consummation of the project that unsafe, unsightly, or insanitary buildings alone be taken or whether title to the land be included, any more than it is the function of the courts to sort and choose among the various parcels selected for condemnation.

"The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking." *Berman* v. *Parker, supra* (1954), 348 U. S. 26, 36, 99 L. Ed. 27, 39, 75 S. Ct. 98. See also: *Foeller* v. *Housing Authority of Portland, supra* (1953), 198 Ore. 205, 256 P. 2d 752, 775; *State* v. *Rich, supra* (1953), 159 Ohio St. 13, 110 N. E. 2d 778, 788-789.

*Seventh:* Because of the result which we have reached, it is not necessary to consider appellant's question on the equity jurisdiction of the court to grant the relief sought.

For the foregoing reasons the judgment of the trial court must be affirmed.

Judgment affirmed.

Landis, C. J., and Emmert, J., concur.

Achor, J., dissents with opinion in which Arterburn, J., concurs.

### DISSENTING OPINION

ACHOR, J.—We are not concerned in this case with a question of whether or not the appellee Indianapolis Redevelopment Commission exercised commendable restraint with regard to this particular redevelopment project. However the seriousness of the question confronting us is demonstrated by the fact that only the legality and not the wisdom of the sweeping action of such bodies may be considered on judicial review. *Benton County Council* v. *State ex rel. Sparks* (1946), 224 Ind. 114, 121, 65 N. E. 2d 116; *Lost Creek School Twp., Vigo County* v. *York* (1939), 215 Ind. 636, 648, 21 N. E. 2d 58.

In this case our concern is whether the Redevelopment Act itself meets the requirements of the Due Process clause of the Fourteenth Amendment to the Constitution of the United States, by providing reasonable guides or standards for the extraordinary exercise of the police power, which the Redevelopment Act [§48-8501, *et seq.*, Burns' 1950 Repl.] [Acts 1945, ch. 276, and ch. 170 of the Acts of 1957] purports to authorize.

Although it is true that this court will, with great reluctance only, strike down the acts of the legislature on the ground of unconstitutionality,[1] it is equally true that the protection of all citizens in their constitutionally guaranteed right to be secure in their possessions and property, except by due course of law, is one of the most solemn obligations of this court.[2]

Numerous cases have been cited in which the courts have upheld slum clearance laws as providing reason-

---

1. *Illinois Steel Company* v. *Fuller* (1939), 216 Ind. 180, 23 N. E. 2d 259.
2. *Hanley* v. *State, Dept. of Conversation et al.* (1955), 234 Ind. 326, 123 N. E. 2d 452, Rehearing denied 126 N. E. 2d 879.

able guides or standards for their application. *Edwards v. Housing Authority of City of Muncie* (1939), 215 Ind. 330, 19 N. E. 2d 741. However the clearance of slums, where people live in unsanitary and unsafe conditions and the mere development of "blighted" or undeveloped areas, as provided in the Act before us, constitute quite a different situation. The Act with which we are here confronted ventures far into unchartered fields, where the standard pertaining to housing projects are not applicable. True, Section 2 of the 1945 Act [§48-8502] recognizes that there are areas wherein ". . . the available buildings are used in a large part as dwelling accommodations . . . ;" which ". . . accommodations . . . are to a large extent unsanitary and unsafe, . . ."

However, the above statement provides no guide or standard for condemning so-called "blighted areas" outside or beyond such slum areas themselves. Neither does the express definition of "blighted areas" as used in Section 2 of the 1945 Act provide any clearly ascertainable guide or standard by which either the Commission or courts of review can determine the propriety of the condemnation of areas not occupied as housing accommodations. In fact, Section 3 of the 1945 Act [§48-8503] makes no reference whatever to housing accommodations. Said section merely defines "blighted area" as follows:

" 'Blighted area' shall mean any area within the corporate limits of a city to which this act is applicable, or in unincorporated territory within one thousand [1,000] feet of such corporated limits, which because of lack of development, cessation of growth, deterioration of improvements or character of occupancy, age, obsolescence, sub-standard buildings or other factors which have impaired values or prevent a normal development of property, or use thereof, has become under current con-

ditions undesirable for or impossible of normal development and occupancy."

I submit that the statement of conditions stated in the above definition are so vague that they provide no standard, either in fact or in law which could, with any degree of certainty, provide a clear standard for justifying the action of the Commission, either in the first instance or on judicial review. For example, by what standard of time or physical circumstance can mere "lack of development" of an area be considered cause for appropriation and condemnation of private property at public expense? By what standard can mere "cessation of growth" constitute cause for appropriation by condemnation? By what standard can it be determined that mere "deterioration of improvements" is cause for condemnation, or that the mere "character of occupancy" is cause to warrant public appropriation? By what standard can it be determined that "age" of the property warrants condemnation, or that a building, because of "obsolescence" or being "sub-standard" may be condemned and appropriated at public expense, all as provided in Section 3 of the 1945 Act? The answer to these questions is not to be found in the Act.

Furthermore, Section 3 of the 1945 Act expressly grants the Commission almost unrestrained freedom in declaring the existence of "blighted areas" by further providing that property within such areas may be condemned and appropriated because of "other factors which have impaired values or prevent a normal development of property, or use thereof," without any attempt to state what such "other factors" might be.

If, under the Act, the Commission concludes that a citizen's property is located in an area which, in its opinion, stands in the way of progress, by what standard is he able to resist its appropriation? It occurs to

me that the only limitations upon the extraordinary exercise of the police power, as authorized by the Act, are the limits of the imagination and the social philosophy of the planners themselves. For this reason I believe the Act is unconstitutional.

Arterburn, J., concurs.

NOTE.—Reported in 154 N. E. 2d 515.